William J. Edelman (SBN 285177)
**MILBERG, PLLC**
~~227 W. Monroe Street, Suite 2100~~280 S. Beverly Drive, Penthouse
~~Chicago, IL 60606~~Beverly Hills, CA 90212
Tel: (771) 474-1121
wedelman@milberg.com

*Attorneys for Plaintiff and Proposed Class*
*(Additional Counsel on Signature Page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AUSTIN BEAULIER, individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Civil Action No. ~~3:26-cv-02632~~3:26-cv-02632-CRB<br><br>**~~CLASS ACTION COMPLAINT~~FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Austin Beaulier ("Plaintiff") ~~brings this class action complaint ("Complaint")~~brings this first amended class action complaint ("Complaint") on behalf of himself and all others similarly situated (the "Class Members") against Meta Platforms, Inc., ("Defendant" or "Meta") for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202. The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to himself and his own actions and counsels' investigation, and upon information and belief as to all other matters, are as follows:

**NATURE OF THE ACTION**

1. This is a nationwide class action for violations of § 1202 of the Digital Millennium Copyright Act ("DMCA"). The case arises from ~~Defendant's removal or failure to preserve machine-readable~~Defendant's intentional removal of machine-readable copyright management information ("CMI"), including: creator attribution and license designation associated with works created by independent artists and designers when those works were copied and processed for use in training large-scale generative artificial intelligence ("AI") systems. That information was not incidental to the works: it was carried in the structured records Defendant loaded to obtain the works and, for Sketchfab works, within the model files themselves, and its absence from Defendant's training data reflects a decision about which fields to retain, not a byproduct of file conversion.

2. This action arises from the large-scale commercial exploitation of millions of digital three-dimensional ("3D") models created by independent artists and designers and shared online under Creative Commons licensing terms. These works were collected through automated web-crawling tools and aggregated into massive machine-learning datasets, including the widely used Objaverse-XL dataset, which contains more than ten million 3D assets sourced from publicly accessible repositories such as Sketchfab, Thingiverse, Polycam, and GitHub.

3. These datasets were assembled by collecting millions of user-generated 3D models that individual creators uploaded to online repositories under various Creative Commons licenses. Those licenses permit reuse only under specific conditions established by the creators, including requirements that downstream users provide attribution, restrictions on commercial exploitation, limitations on derivative works, and other conditions governing the permitted use of the works.

4. This case is not about challenging generative artificial intelligence research as a whole. Rather, large technology companies may not ingest Creative Commons-licensed works into AI training pipelines and deploy the resulting generative systems in commercial products and platforms without complying with the license conditions that governed those works when they were originally published.

5. Defendant's conduct follows a common structural pattern. First, individual creators upload original 3D models to online repositories such as Sketchfab and Thingiverse under Creative Commons license terms that preserve attribution rights and impose other conditions on reuse. Second, researchers and dataset curators aggregate links or directives to those models into large-scale training datasets such as Objaverse-XL. ~~Third, commercial technology companies use those datasets to identify and download the 3D models. Fourth, commercial technology companies prepare and render the downloaded 3D models for ingestion into generative AI models while stripping the models of CMI.~~Third, commercial technology companies load the datasets' per-object records—which state each work's source, license, file identifier, and content hash—to identify, retrieve, and verify the 3D models. Fourth, commercial technology companies evaluate and filter the downloaded models one by one, render them for ingestion into generative AI models, and decide which of the accompanying fields to carry into their training data—retaining the fields useful to training while stripping the models of CMI. Finally, those models are integrated into monetized consumer and enterprise ecosystems, allowing companies to generate revenue from systems trained on the works of millions of creators.

6. By ingesting Creative Commons-licensed works into commercial AI training pipelines without preserving attribution information, without complying with license conditions, and without authorization from the creators whose works were used, Defendant has exploited the openness of the online 3D-model community while disregarding the legal obligations that govern the reuse of those works.

7. The conduct alleged here reflects a broader systemic practice in which commercial entities build generative AI systems by ingesting large-scale datasets derived from online creative communities while disregarding the licensing conditions governing those works.

8. Importantly, the creators whose works were incorporated into these datasets are not anonymous or unknowable. Unlike certain web-scraping contexts in which the origin of training data is difficult to determine, the Objaverse-XL dataset itself preserves links to the original source files and creator accounts from which the models were obtained. This makes it possible to identify with precision the artists whose works were incorporated into the datasets used to train generative systems. For each Sketchfab-sourced work, the dataset's annotation table identifies the source URL and platform, states the applicable license in a dedicated field, and records the file type and a content hash; the collection from which the dataset's software retrieves those works maintains a per-object record with the creator's username, display name, and profile URL; and the model files themselves carry the work's title and source URL, the creator's name and profile URL, and the license and license URL in their headers.

9. The Copyright Clause of the United States Constitution empowers Congress to protect works of human creativity. These protections encourage creators to devote effort and resources to creative enterprises by providing confidence that their works will be shielded from unauthorized exploitation.

10. In recognition that emerging technologies could be used to evade statutory protections, Congress enacted the Digital Millennium Copyright Act in 1998. Among other things, the DMCA prohibits the intentional removal or alteration of copyright management information associated with a protected work when the actor knows, or has reason to know, that doing so will induce, enable, facilitate, or conceal infringement.

11. Plaintiff brings this action to enforce those rights and to ensure that creators whose works were incorporated into Defendant's generative AI systems are afforded the protections guaranteed by federal copyright law.

12. Meta entered the generative 3D space through the release of its SAM-3D system in November 2025, a model designed to generate high-quality 3D objects from single 2D images.

13. ~~Meta has publicly acknowledged training SAM-3D on a massive dataset derived from Objaverse-XL, including millions of 3D meshes that were rendered from multiple viewpoints and incorporated into its pretraining pipeline.~~Meta has publicly acknowledged, in the technical report accompanying SAM-3D, that it pretrained the model on approximately 2.7 million object meshes selected

from Objaverse-XL and from sources it separately describes as "licensed datasets," and that it rendered each selected mesh from 24 viewpoints to create images for its pretraining corpus. By describing "Objaverse-XL" and "licensed datasets" as distinct sources, Meta's report does not represent that the Objaverse-XL works were licensed to Meta; nor does the report identify the creator, license, or source of any Objaverse-XL work Meta selected, although that information accompanied each work in the records and files from which it was obtained.

14. Meta's broader commercial strategy spans immersive computing, augmented and virtual reality, and creator-driven platforms, including Horizon Worlds, avatar systems, and the Meta Quest ecosystem. Meta has expressly identified Objaverse-XL as a foundational input to its 3D generative systems, embedding these assets into products and infrastructure designed for widespread developer and consumer use.

15. At the same time, ~~Meta has removed or failed to preserve important CMI~~Meta removed important CMI, including attribution and licensing information, for the Objaverse-derived works it used to fuel its systems. Upon information and belief, Meta sourced, rendered, and transformed Objaverse-derived works into machine-learning inputs ~~in a manner that removed, failed to preserve, or disregarded creator-identifying information~~in a manner that removed creator-identifying information, licensing terms, and other copyright management information, and integrated those CMI-stripped works into its commercial AI systems, in violation of the DMCA~~integrating those CMI-stripped works into its commercial AI systems and further distributing those CMI-stripped works, both in violation of the DMCA~~.

## JURISDICTION AND VENUE

### A. Jurisdiction

16. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Copyright Act of 1976, 17 U.S.C. § 101, et seq., as amended by the Digital Millennium Copyright, 17 U.S.C. § 1202 et seq.

17. This Court has personal jurisdiction over because Defendant resides in this District, maintains its principal place of business in this District, conducts substantial business in this District, and has purposefully directed the conduct alleged herein toward this District.

18. Upon information and belief, Defendant Meta maintains its headquarters at 1 Meta Way, Menlo Park, CA 94025 within this District.

19. Defendant has purposefully availed itself of the privilege of conducting business within this District and has derived substantial revenue from its activities directed at residents of this District and throughout the United States.

**B. Venue**

20. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

21. Venue is further proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendant developed, trained, and/or deployed generative artificial intelligence systems within this District that were trained using datasets containing Plaintiff's copyrighted works and associated copyright management information.

22. Defendant conducts substantial business in this District and regularly engages in interstate commerce within this District.

23. Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because Defendant is subject to personal jurisdiction in this District.

## PARTIES

**A. Plaintiff**

24. Plaintiff Austin Beaulier is an individual and a professional 3D artist, developer, and visual effects creator residing in the Los Angeles, California area.

25. Plaintiff specializes in creating digital three-dimensional models, photogrammetry scans, and other visual assets used in animation, visual effects, virtual environments, and related digital media applications.

26. Plaintiff has more than eight years of experience producing photorealistic 3D assets and working with advanced 3D modeling, scanning, and machine-learning technologies.

27. Plaintiff publishes and distributes original 3D models and related digital works through online platforms used by the global 3D artist community, including repositories such as Sketchfab, CGTrader, Thingiverse, and Polycam and other digital asset platforms.

28. Plaintiff owns the copyrights and other exclusive rights in his original 3D works that he created and published online.

29. Plaintiff's original 3D works are included in Objaverse-XL and related derivative datasets, used to train Defendant's AI systems.

30. Plaintiff brings this action individually and on behalf of a class of similarly situated creators whose 3D models and works were incorporated into large-scale AI training datasets used to train Defendant's generative AI systems.

### B. Defendant

31. Defendant Meta is a corporation organized under the laws of the State of Delaware with its principal place of business in Menlo Park, California.

32. Meta is a multinational technology company that owns and operates major digital platforms and services including Facebook, Instagram, WhatsApp, and other online products and services. Meta also develops advanced artificial intelligence systems and immersive computing technologies, including generative AI models designed to analyze and generate three-dimensional content.

## FACTUAL ALLEGATIONS

### A. The Online 3D Model Creator Ecosystem

33. Over the past two decades, a large online ecosystem has emerged in which artists, designers, engineers, hobbyists, and developers create and share digital 3D models. These models are used across numerous industries and creative fields, including video game development, animation,

virtual and augmented reality environments, product design, architecture, robotics, and additive manufacturing.

34. A substantial portion of this ecosystem operates through public repositories that allow creators to upload and distribute their works to others. These repositories include platforms such as Sketchfab, Thingiverse, Polycam, and other web-based archives that host user-generated 3D content.

35. These platforms collectively host millions of digital 3D models representing a wide range of objects, including characters, vehicles, architecture, mechanical components, and natural environments. Individual creators invest substantial time, skill, and creative effort into producing these models using specialized design tools and software.

36. The online ecosystem for sharing and distributing digital 3D models has thus developed around open licensing frameworks that allow creators to share their work while retaining specifically defined legal rights.

37. Many creators choose to share their works publicly in order to contribute to collaborative design communities, build professional portfolios, and allow other artists and developers to reuse their work in legitimate creative projects.

38. To facilitate lawful sharing while preserving creators' rights, these platforms commonly require creators to select a license governing how their work may be reused by others. In the 3D-modeling ecosystem, those licenses are frequently Creative Commons licenses. The models identified through datasets such as Objaverse-XL are not governed by a single uniform license.

39. These Creative Commons licenses serve two complementary purposes. First, they allow creators to share their work freely with the broader community in the spirit of collaborative creativity and open innovation. Second, they preserve core protections that allow creators to maintain recognition and control over how their works are reused.

40. In general, Creative Commons licenses commonly require downstream users to comply with obligations such as providing attribution to the creator, refraining from commercial exploitation, or distributing derivative works under the same licensing terms.

41. More specifically, where works are licensed under CC-BY(Attribution), the work may be reused provided that the original creator receives proper credit. CC-BY 4.0 requires that attribution information associated with the work be preserved and communicated when the work is reproduced or reused. Where works are licensed under CC-BY-NC (Non-Commercial), commercial use is prohibited. Where works are licensed under CC-BY-SA, derivative works must be distributed under the same licensing terms as the original work. Each of these licenses imposes distinct obligations on downstream users of the work.

42. None of these licenses authorizes the removal of CMI. The Creative Commons Attribution 4.0 license conditions every reuse of a licensed work on retaining, if supplied by the licensor, "identification of the creator(s) of the Licensed Material," "a copyright notice," "a notice that refers to this Public License," and "a URI or hyperlink to the Licensed Material," and on indicating that the work is licensed under that license. CC BY 4.0 § 3(a)(1). Its Non-Commercial and Share-Alike variants carry the same attribution conditions. Upon information and belief, Sketchfab's Standard license, under which many Class members' works are published, likewise requires that the creator be credited and does not authorize removal of the creator-identifying information or license terms that accompany a downloaded model. And the NoAI designation withholds permission for the use to which Defendant put the works altogether. Whatever else these licenses permit, none permits a licensee to strip from a work the information identifying its creator and the terms of its use.

~~42.~~43. Importantly, these licenses operate on a per-work basis. When a creator uploads a model to platforms such as Sketchfab or Thingiverse, the creator selects the specific license governing that particular work. As a result, two models hosted on the same platform may be subject to entirely different licensing conditions depending on the choices made by their creators.

~~43.~~44. Because these requirements are attached on a work-by-work basis, users of large collections of 3D models must preserve and track attribution, license designations, and related CMI for each individual asset if they intend to comply with the governing terms.

~~44.~~45. This structure presents significant compliance challenges. When a system relies on hundreds of thousands or millions of individual models originating from multiple platforms and governed

by different license terms, compliance with attribution and licensing requirements requires tracking and preserving CMI on a per-work basis.

~~45.~~46. Upon information and belief, Defendant did not maintain a system capable of tracking, preserving, and reproducing the attribution and licensing information required by these licenses on a per-work basis throughout the process by which the works were copied, converted, rendered, normalized, and ~~ingested into AI training inputs.~~ingested into AI training inputs—even as Defendant's systems created and maintained other per-work records concerning the same works, including content hashes and file identifiers.

~~46.~~47. Defendant's practices made compliance with the licensing requirements governing those works effectively impossible. For example, where a work was licensed under CC-BY or CC-BY 4.0, the license required that the user provide attribution to the creator when the work was reproduced, distributed, or otherwise used. Yet Defendant's training pipeline incorporated large numbers of works into machine-learning systems without preserving the identity of the creators or the licensing information associated with each work.

~~47.~~48. Where works were licensed under terms that restrict commercial exploitation—including CC-BY-NC—using those works to train commercial generative AI systems exceeded the scope of the license granted by the creator.

~~48.~~49. Similarly, where works were licensed under share-alike provisions such as CC-BY-SA, the use of those works in downstream generative systems raised further obligations that Defendant did not attempt to satisfy.

~~49.~~50. Defendant's conduct alleged herein created a substantial certainty that works subject to restrictive licensing conditions would be copied, processed, and used in AI training systems without authorization and without compliance with the terms governing those works.

~~50.~~51. Defendant's practices undermined the licensing framework that has enabled the collaborative development of the online 3D-model ecosystem.

### B. Sketchfab's NoAI Designation as Copyright Management Information

~~51.~~52. Sketchfab is a widely used online platform that allows creators to upload, publish, and distribute digital 3D models for use in video games, animation, virtual reality, engineering, and other digital media applications. The platform hosts millions of user-generated 3D models created by artists, designers, engineers, and hobbyists who share their works with the broader creative community.

~~52.~~53. Sketchfab requires creators who make models available for free download to select a Creative Common license governing the work.

~~53.~~54. In February 2023, in response to growing concerns within the artist community regarding the use of online artwork to train generative artificial intelligence systems, Sketchfab introduced a platform feature known as the "NoAI" tag.

~~54.~~55. The NoAI tag allows creators to designate that their models may not be used for generative AI data collection, dataset creation, or AI model training.

~~55.~~56. When a creator applies the NoAI designation to a model, Sketchfab embeds a corresponding HTML meta tag within the model's webpage indicating that the work is disallowed for use in generative AI datasets or training pipelines. This tag functions as a machine-readable signal that can be detected by automated tools accessing the platform. On the model's public page, Sketchfab also displays the designation to human visitors in plain text: "NoAI: This model may not be used in datasets for, in the development of, or as inputs to generative AI programs." The corresponding machine-readable tag reads: <meta name="robots" content="index, noAI">.

~~56.~~57. In other words, the NoAI designation is implemented through machine-readable metadata embedded in the model's webpage and associated platform data. This metadata is designed to be detected by automated systems accessing the platform and communicates that the work may not be used in generative AI datasets or training pipelines.

~~57.~~58. Sketchfab simultaneously updated its platform policies and terms of use to reinforce the significance of this designation. ~~Under those terms, users are prohibited~~Under those terms, which took effect on March 23, 2023, users are prohibited from using models marked with the NoAI tag in datasets used for developing or training generative AI systems, in the development of such systems, or as inputs into such systems.

58.59. The platform does not apply the NoAI designation automatically. Instead, creators must actively choose to apply the tag to their projects. This design reflects that the tag represents a deliberate decision by the creator to impose a specific restriction governing the use of the work.

59.60. The NoAI designation therefore operates as a creator-imposed restriction governing how a particular work may be used. When applied, it communicates that the creator has expressly withheld permission for the work to be incorporated into AI training datasets or similar automated data-collection systems.

60.61. This designation of the type of Creative Common license constitutes CMI within the meaning of 17 U.S.C. § 1202(c). Specifically, the NoAI tag falls under § 1202(c)(6), which covers "terms and conditions for use of the work." By designating a model as NoAI, the creator attaches a specific usage restriction to the work indicating that it may not be used for AI training purposes.

61.62. Functionally, the NoAI designation operates in the same manner as other forms of digital rights-management information, such as embedded license notices, copyright metadata, or digital watermarks that communicate restrictions on the use of copyrighted works.

62.63. In copying, converting, and preprocessing the works for use in machine-learning training pipelines, Defendant removed, failed to preserve, or disregarded the NoAI tag. The NoAI designation is conveyed on the work's page on Sketchfab, and the copies and records from which Defendant worked carried the address of that page: the URL of a work's Sketchfab page is recorded within the model file Sketchfab generates for download and is the identifier by which the Objaverse-XL annotations reference each Sketchfab work. A link to a work's copyright management information is itself copyright management information. 17 U.S.C. § 1202(c)(7) ("links to such information"). In copying, converting, and preprocessing the works for use in machine-learning training, Defendant removed that link together with the works' other CMI, severing each work from the designation and terms displayed on its page. To the extent Defendant obtained works directly from Sketchfab after February 2023, the NoAI designation was conveyed with those works in machine-readable form, and the copies Defendant made and the training records Defendant created omit it.

~~63.~~64. Accordingly, ~~the removal, alteration, or disregard of the NoAI designation~~the removal or alteration of the NoAI designation, and of the links through which that designation is conveyed, in connection with copying, downloading, processing, or ingesting Sketchfab models into AI training pipelines constitutes the removal or alteration of copyright management information within the meaning of 17 U.S.C. § 1202.

**C. Copyright Management Information in the 3D Model Ecosystem**

~~64.~~65. The works created by Plaintiff and members of the proposed Class were originally distributed on platforms such as Sketchfab, Thingiverse, and Polycam together with creator-identifying information, licensing information, attribution requirements, and other information governing the permitted use of the works.

~~65.~~66. This information commonly includes the title of the work, the identity of the creator, links to the creator's account or portfolio, the type of Creative Common license governing how the work may be used, and associated terms or conditions communicated on the platform page or in associated metadata fields.

~~66.~~67. These data fields constitute CMI within the meaning of the DMCA. Section 1202(c) defines CMI broadly to include, among other things, the title and identifying information of a work, the name and identifying information of the author or copyright owner, and the terms and conditions governing the use of the work.

~~67.~~68. The licensing designations attached to models hosted on platforms—including Creative Commons license selections—therefore constitute CMI because they communicate the terms and conditions under which the work may be reused.

~~68.~~69. This information, including the creator's identity and the terms governing reuse, is commonly conveyed through metadata attached to the work.

70. The CMI described above is not merely displayed near the works on platform webpages; it travels with the works in machine-readable form. When a work is downloaded from Sketchfab, the platform delivers the model as an archive that includes, alongside the model's geometry and texture files,

a license file identifying the work's title, its source URL on Sketchfab, its author and the author's profile URL, the governing license and license URL, and the attribution statement required for reuse of the work.

71. Sketchfab also embeds CMI within the model file itself. The glTF/GLB model files that Sketchfab generates for download contain, in the file's standard "asset" header, an "extras" metadata block recording the work's title, its author and the author's Sketchfab profile URL, its license and the license URL, and the URL of the work's source page, together with a "generator" field identifying Sketchfab as the creator of the file. Any software that parses a glTF/GLB file in order to process the model reads the file's "asset" header; software that converts such a file into another representation encounters this embedded CMI in the course of the conversion.

72. Carrying attribution and licensing information within a 3D model file is a standard, supported feature of the format in which the works were distributed. The glTF 2.0 specification—the industry-standard 3D asset interchange format maintained by the Khronos Group—defines a dedicated "asset.copyright" property, described in the specification as "[a] copyright message suitable for display to credit the content creator," as well as an "extras" property that permits application-specific metadata, such as authorship and license information, to travel within the file.[1] Defendant's own SAM 3D system works in this same format: the meshes SAM 3D generates and delivers to users of Defendant's public demonstration are glTF/GLB files.

73. Machine-learning training data is likewise capable of carrying per-work CMI. A training corpus is a collection of per-work records whose fields are defined by the party that builds the corpus, and per-work provenance metadata routinely accompanies training data at scale. Objaverse-XL itself distributes, for each of the more than ten million objects it indexes, a structured metadata record identifying, among other things, the object's source repository, its source URL or file identifier, its license, and a cryptographic content hash (a "SHA-256" hash) uniquely identifying the file's contents. Publicly distributed research datasets key additional per-object annotations, such as textual captions, to

[1] See glTF 2.0 Specification (Khronos Group), https://registry.khronos.org/glTF/specs/2.0/glTF-2.0.html.

the same object identifiers across more than a million Objaverse objects, and widely used image-training corpora distribute per-item source and metadata tables across billions of items.

74. Accordingly, preserving each work's creator, title, license terms, and the link to its source page (the means by which any NoAI designation is conveyed) through an AI training pipeline is technically routine: it requires only that the party building the training corpus carry forward, in its own records, machine-readable fields that accompany the works—within the model files themselves, within the download archives, and within the dataset annotations—at negligible cost. No format used at any stage of the pipeline alleged in this Complaint is incapable of accommodating CMI.

### D. Registration Is Not Required for Plaintiff's DMCA Claims

~~69.~~75. Plaintiff and the members of the proposed Class are creators who design, author, and publish original digital 3D models on online platforms. These creators retain copyright interests in their works and routinely distribute their models publicly through these platforms, accompanied by creator attribution information and other CMI identifying the author of the work.

~~70.~~76. A significant portion of these creators, however, have not formally registered their works with the United States Copyright Office. This is consistent with the norms of the online 3D-modeling community, where individual creators frequently publish original works for download, collaboration, or portfolio display without undertaking the administrative burden and expense associated with federal copyright registration.

~~71.~~77. Defendant's conduct nevertheless gives rise to liability under Chapter 12 of the Copyright Act regardless of whether Plaintiff's works were registered. Claims arising under 17 U.S.C. § 1202 constitute independent statutory violations separate and distinct from claims for direct copyright infringement.

~~72.~~78. Unlike infringement claims under 17 U.S.C. § 501, which are subject to the registration prerequisite of 17 U.S.C. § 411(a), causes of action under Chapter 12 do not require a plaintiff to obtain a prior copyright registration before bringing suit.

~~73.~~79. Defendant's conduct injured Plaintiff and the proposed Class by interfering with the statutory protections afforded to creators under Chapter 12 of the Copyright Act, including protections

designed to preserve attribution information and safeguard digital works from unauthorized copying, processing, and downstream exploitation.

~~74.~~80. As a result, Defendant cannot evade liability for its violations of 17 U.S.C. § 1202 merely because the affected creators had not registered their works with the Copyright Office.

**E. Objaverse-XL and Related Datasets**

~~75.~~81. In recent years, researchers and technology companies have assembled large-scale datasets of 3D models in order to train artificial intelligence systems capable of generating new 3D content.

~~76.~~82. One of the most widely used datasets for this purpose is Objaverse, and its expanded successor Objaverse-XL, which was released in 2023.

~~77.~~83. Objaverse-XL is an academic dataset composed of more than 10 million 3D assets collected from publicly accessible repositories containing user-generated 3D models.

~~78.~~84. The dataset aggregates models from numerous online platforms, including Sketchfab, Thingiverse, Polycam, GitHub, and other repositories where creators publish and distribute digital 3D assets.

~~79.~~85. Because the source platforms allow creators to select licensing terms for each individual model, the assets referenced in Objaverse-XL are associated with a wide variety of Creative Commons licenses and other usage restrictions imposed by the creators who authored those works.

~~80.~~86. Objaverse-XL preserves references to the original source files, source repositories, and creator accounts from which the models were obtained. These links allow researchers and downstream users to trace assets back to the platform and creator from which they originated. By contrast, Defendant's curated training datasets and generative systems do not retain or communicate that information, thereby severing the connection between the work and the creator.

~~81.~~87. The existence of these links makes it possible to identify the individual artists and designers whose works were incorporated into or referenced by the dataset—which is important for attribution.

~~82.~~88. These datasets have been used by commercial technology companies to train foundation-scale generative models capable of automatically producing new 3D objects, environments, and digital assets.

~~83.~~89. Once trained, these systems can produce new 3D assets through automated prompts or programmatic interfaces and can be integrated into commercial platforms, developer tools, and enterprise software systems.

~~84.~~90. Several major technology companies—including Meta—have publicly disclosed using datasets derived from Objaverse-XL to train generative 3D models that are incorporated into commercial products, research initiatives, or developer ecosystems.

~~85.~~91. Datasets such as Objaverse-XL function as a structured index of publicly hosted 3D models, preserving references to the online repositories where those works were originally published.

92. Objaverse-XL is distributed as a structured index together with tooling that operates on that index. The dataset's official software exposes the corpus as machine-readable annotation tables—including, for each object, its source, license, file identifier, and SHA-256 content hash—and its download functions take those annotation records as their input: a user obtains the underlying 3D files by loading the metadata records and passing them to the download tooling. For works hosted on Sketchfab, each object's file identifier is a URL of the form "https://sketchfab.com/3d-models/{identifier}," which resolves to the work's Sketchfab model page—the page bearing the work's title, creator, license designation, and, where applied, the NoAI meta tag. The Objaverse-XL research paper itself instructs that "[u]sers must follow the license of the content with which the original files were distributed and the terms of service for each platform." The software cannot retrieve a work without the record that states its license: to request an object, a user supplies values drawn from its annotation record—the object's source, its file identifier or URL, and its content hash—and, for Sketchfab-sourced objects, the same record states the applicable Creative Commons license in a dedicated field.[2]

[2] See *Objaverse-XL: A Universe of 10M+ 3D Objects*, arXiv:2307.05663 (2023), https://arxiv.org/abs/2307.05663; https://objaverse.allenai.org.

93. For works originating on Sketchfab, the Objaverse-XL tooling does not retrieve files from Sketchfab at all. The Sketchfab portion of Objaverse-XL consists of the approximately 800,000 objects collected for the earlier Objaverse 1.0 dataset, and the official tooling retrieves those files from a copy of that collection hosted on the Hugging Face platform (huggingface.co/datasets/allenai/objaverse). The files in that collection are the glTF/GLB files Sketchfab generated for download, with the embedded "asset" metadata described above intact, and the collection is accompanied by per-object records recorded from Sketchfab identifying each work's title, its creator's username, display name, and profile URL, its license, and the URL of its page on Sketchfab. Model files retrieved through the dataset's own software carry the author and license information described above in their headers. Upon information and belief, Defendant obtained the Sketchfab-originated works either from that hosted copy or directly from Sketchfab. By either route, the copies Defendant obtained carried the works' CMI within the files themselves and in the accompanying records.

~~86.~~94. Repositories, such as Sketchfab, Thingiverse, Polycam, GitHub, and others, distribute creator-uploaded models together with CMI, including the creator's identity, licensing terms, attribution requirements, and other information governing the permitted use of the work.

~~87.~~95. Upon information and belief, Defendant used Objaverse-derived datasets as a source map to identify and obtain copies of 3D models. After obtaining those works, Defendant copied, converted, rendered, normalized, and otherwise processed the models through machine-learning preprocessing pipelines. In the course of that process, ~~the creator-identifying information, licensing metadata, and other CMI that accompanied the works when originally distributed were removed, failed to be preserved, or otherwise disregarded, resulting~~Defendant removed the creator-identifying information, licensing metadata, and other CMI that accompanied the works when originally distributed, resulting in the use of CMI-stripped representations of Plaintiff's works within Defendant's AI training datasets.

~~88.~~96. As a result, the representations of Plaintiff's and class members' works used within Defendant's generative AI training systems no longer contained the attribution, licensing information, or other copyright management information associated with those works when they were originally distributed.

**F. Defendant's Use of Plaintiff's Works for ~~AI Training and Failure to Preserve CMI~~AI Training and Removal of CMI**

~~89.~~97. Large technology companies, such as Defendant, have incorporated Objaverse, Objaverse-XL and Objaverse-derived datasets into the training pipelines for commercial generative artificial intelligence systems designed to create new 3D models and digital environments.

~~90.~~98. Upon information and belief, Defendant trained its generative 3D systems using assets drawn from Objaverse-XL or derivative subsets of that dataset.

~~91.~~99. The conduct alleged in this action follows a consistent technological pipeline through which Defendant identified, obtained, and processed Plaintiff's works for use in generative artificial intelligence training systems.

~~92.~~100. First, individual creators—including Plaintiff and members of the proposed Class—published original 3D models on online repositories such as Sketchfab, Thingiverse, and Polycam. When those works were distributed on those platforms, they were accompanied by CMI, including the creator's identity, the title of the work, licensing terms governing reuse, attribution requirements, and other information identifying the conditions under which the work could be used.

~~93.~~101. Second, researchers compiled datasets such as Objaverse-XL, which aggregate references to millions of these models and preserved source information sufficient to identify the online repositories where the works were hosted. These datasets functioned as a structured index that enabled downstream users to locate the underlying works on the platforms where they were originally published. These datasets also contain metadata identifying the Creative Common license, and other terms of use, associated with the work.

~~94.~~102. Third, commercial entities use those datasets as a source map to identify and obtain the referenced 3D assets from the online repositories where those works were originally hosted, or from copies of those works hosted elsewhere, including the Objaverse collection hosted on Hugging Face.

~~95.~~103. Fourth, and most importantly, after obtaining copies of the works, Defendant processed the models through machine-learning preprocessing pipelines designed to convert raw 3D assets into training inputs suitable for generative AI systems.

~~96.~~104. Training generative artificial intelligence systems requires converting raw creative works into machine-learning representations that can be processed by neural networks.

~~97.~~105. In the context of 3D generative models, this process involves transforming raw 3D asset files into numerical or visual representations that can be used as training inputs.

~~98.~~106. This preprocessing typically includes operations such as format conversion, mesh normalization, rendering, voxelization, and other transformations designed to convert the geometry and textures of a 3D model into data structures suitable for machine-learning training.

~~99.~~107. During these transformations, the creative content of the work—such as its geometry, structure, textures, and visual features—is preserved in numerical or visual form so that the model can learn patterns from the training data.

~~100.~~108. ~~However, during this process, the works are separated from~~However, during this process as Defendant configured it, the works are separated from the attribution information, licensing terms, and other CMI that accompanied the works when they were originally distributed on their source platforms.

~~101.~~109. Thus, the creator-identifying information, licensing metadata, attribution requirements, and other CMI that accompanied the works when originally distributed ~~were removed, failed to be preserved, or otherwise disregarded.~~were removed.

110. The separation of the works from their CMI was not the product of ignorance of that CMI. Defendant's pipeline operated on the works' CMI in order to build its training corpus in the first place. Upon information and belief, Defendant's systems ingested and parsed the Objaverse-XL annotation records—including the license and source fields—to identify, locate, download, deduplicate, and track the works, and, for Sketchfab-hosted works, parsed model files whose embedded "asset" metadata identified each work's title, author, license, and source. Defendant's systems thus read the works' CMI at the acquisition and processing stages, used the portions of that metadata that served Defendant's engineering purposes, and omitted from the training corpus the fields recording each work's creator, title, license terms, and usage restrictions.

111. The copies from which Defendant's pipeline removed CMI were the works themselves. Objaverse-XL identifies each object by the SHA-256 hash of its file contents, and, upon information and belief, the files Defendant downloaded were identical to the files distributed for download of the works—for Sketchfab works, the files Sketchfab generated—as the dataset's content hashes reflect, with the CMI conveyed within and alongside each file intact. Defendant's systems held those identical copies, read their CMI, and then stripped that CMI from them as it converted them into training copies, keeping records of them from which it was likewise absent. The only material difference between the copies Defendant obtained and the copies Defendant carried into training is that the CMI is gone. The removal occurred within Defendant's pipeline, on Defendant's own copies of the works; it was not a consequence of any later transformation of the works' content but of Defendant's decision to carry that content forward without the information that identified it.

112. Defendant did not create new works at this stage; it worked on existing copies of the works. The files Defendant obtained were copies of the works—material objects in which the works were fixed—and the CMI at issue was conveyed in connection with those copies: within each Sketchfab file's asset header, in the records that accompanied and identified each file, and through the source-page link recorded in both. Defendant's pipeline opened each of those copies, read the header and records in which its CMI resided, and stripped that information out as it converted the copy into the formats its training used. What emerged was the same work in another format—the same geometry, textures, and appearance—minus its CMI. The pipeline did not learn from the works and generate new objects at this stage; it took existing copies that carried CMI and carried them forward without it. Nor was the works' CMI a visual feature of the models that a particular rendering angle might leave out of frame; it was machine-readable information attached to each copy and its records, which Defendant's pipeline read and then deleted.

113. Defendant's treatment of metadata was selective, not uniform. Upon information and belief, Defendant's data infrastructure created and maintained per-work records about the very works at issue—including content hashes used to deduplicate objects, file identifiers and source locations used to acquire and track objects, and quality or filtering scores used to curate objects—while the training records

Defendant created omitted the adjacent fields recording authorship and license. Defendant defined the schema of its own training records: it selected which per-work fields its corpus would keep and which it would discard. The fields Defendant kept were those useful to model training and corpus management; the fields Defendant discarded were those that identified the works' creators and the legal restrictions on the works' use.

114. The omission of CMI from Defendant's training corpus was therefore an avoidable design choice, not an inherent or necessary feature of machine-learning training. The works' CMI was conveyed in machine-readable form within the model files, within the dataset annotations Defendant's systems read, and, for works obtained from Sketchfab directly, within the download packaging; the formats and record structures Defendant used and created were capable of carrying that information forward; and doing so would have imposed no meaningful cost or burden. Defendant configured its systems to extract and carry forward the works' expressive content—their geometry, structures, textures, and visual features—and other metadata useful to Defendant, while stripping out the CMI that those same sources conveyed. Defendant thereby removed CMI that its systems could have preserved. Nothing about Defendant's use of the works' geometry and textures required disturbing the file header and metadata in which their CMI resided; that information could have remained where it was, or been carried forward in the records Defendant created, at no cost to the training process. Rendering a mesh reads the model's geometry and visual resources; nothing in that operation requires stripping the annotation record from which the model was identified and retrieved, or the file header in which the model's CMI resides. Defendant stripped them nonetheless.

~~102.~~115. ~~As a result, once a work has been converted into machine-learning training inputs, it is no longer possible for the training system itself to identify the creator of the work or to comply with the attribution requirements or licensing conditions associated with that work.~~Because Defendant configured its training records to omit CMI, neither Defendant's training systems nor those systems' users can identify the creator of any given work or comply with the attribution requirements or licensing conditions associated with that work. That incapacity is a condition of Defendant's own making: it results from Defendant's configuration choices, not from any technical constraint of machine-learning training.

~~103.~~116. ~~This separation between the creative content of a work and the CMI that accompanied it is a foreseeable and inherent consequence of using large-scale creative datasets to train generative artificial intelligence systems.~~Defendant knew that its preprocessing pipeline, as Defendant designed and configured it, would separate the creative content of the works from the CMI that accompanied them. That separation was the foreseeable result of Defendant's own configuration choices—and it was avoidable at negligible cost, because the CMI was conveyed in machine-readable form within and alongside the works and could have been carried forward in Defendant's training records.

~~104.~~117. Defendant knew or had reasonable grounds to know that ~~the preprocessing pipelines used to train its generative AI systems would separate~~the preprocessing pipelines used to train its generative AI systems, as Defendant configured them, would separate the creative content of the works from the CMI that accompanied those works when they were originally distributed.

~~105.~~118. Finally, Defendant used these CMI-stripped representations of Plaintiff's works as inputs to train generative AI systems capable of producing new 3D objects, environments, and digital assets, and integrated those systems into commercial products, developer platforms, and enterprise technologies.

~~106.~~119. Through this process, Defendant uses Plaintiff's works as inputs to train generative AI systems capable of producing new 3D content but without the necessary creator-identifying information, license terms, or other CMI associated with those works.

~~107.~~120. As a result, Defendant exploited Plaintiff's copyrighted works to train commercial AI systems ~~after removing, failing to preserve, or disregarding the copyright management information~~after removing the copyright management information associated with those works.

**G. Defendant's Commercial Use of Objaverse in Generative 3D Systems**

~~108.~~121. Defendant Meta released SAM-3D in November 2025. SAM-3D provides "3Dfy" capabilities, taking a single 2D photo to create high-quality 3D reconstructions. Meta has publicly disclosed using assets derived from Objaverse-XL and rendered those 3D models from multiple viewpoints as part of a large-scale pretraining dataset for its SAM-3D product.

~~109.~~122. Specifically, Meta publicly reported pretraining SAM-3D on approximately 2.7 million meshes derived from Objaverse-XL. Meta has positioned this technology within its broader strategy involving immersive computing, augmented reality, virtual reality environments, and generative AI systems integrated into its ecosystem of consumer and developer products.

~~110.~~123. Meta's own research paper[3] positions SAM 3D within broader immersive and commercial ecosystems, including Horizon Worlds, avatar systems, AR/VR tooling, the Meta Quest platform, and related creator-focused AI infrastructure. Meta explicitly identifies Objaverse-XL as a direct input to the training pipeline for its 3D generative system.

~~111.~~124. Meta disclosed no systematic attribution mechanism for the underlying artists whose meshes were incorporated into pretraining, and no filtering process for non-commercial license restrictions. Meta's report describes no license-based exclusion criterion of any kind and does not state that creator or license fields were preserved with the selected meshes.

125. Meta's own public description of the SAM 3D training pipeline confirms that the pipeline was not a blind or undifferentiated transformation, but a curated, multi-stage process involving individualized treatment of works. Meta has disclosed that it pretrained SAM 3D on approximately 2.7 million object meshes derived from Objaverse-XL together with separately licensed datasets; that it curated its pretraining data using a rule-based, per-mesh shape-filtering strategy (removing, for example, overly simplistic geometry and structural outliers) for its geometry model and an aesthetic-score filter for its texture model; and that it rendered each selected mesh from 24 viewpoints. Meta thus made mesh-by-mesh, keep-or-discard decisions about the geometry and appearance of millions of individual source works—while its training corpus preserved no record of any work's creator, title, license, or NoAI designation. Meta's separate, post-training "data engine," in which human annotators reviewed and rated

[3] *See* ~~https://scontent-lga3-3.xx.fbcdn.net/v/t39.2365-6/586242263_2223944168085275_6555215672137606224_n.pdf?_nc_cat=104&ccb=1-7&_nc_sid=3c67a6&_nc_ohc=w9uHRxi5eCIQ7kNvwEelkeI&_nc_oc=Adktlxs8BducObyUJ2CRgmwgqtOvlQeAiiXPgCTAgLWfIrPqRkGhIjNPnmzzfgRspb4HxRNn60zCHtcmtDvN-9zK&_nc_zt=14&_nc_ht=scontent-lga3-3.xx&_nc_gid=DsMZvyCHxaD-IDJ8Yz8i-g&_nc_ss=8&oh=00_Afy1_diPMy3Xyg7qN88N6Y46BRMqUR9ToLOPwk5okud5sw&oe=69BE269D~~*SAM 3D: 3Dfy Anything in Images*, arXiv:2511.16624 (Nov. 2025), https://arxiv.org/abs/2511.16624 (stable location of the paper cited in the original Complaint).

candidate reconstructions against approximately one million images across approximately 3.14 million "model-in-the-loop" meshes, with the hardest cases routed to professional 3D artists, shows the scale of individualized attention Meta was prepared to devote to its training data when it chose to.[4]

126. Meta's differential treatment of provenance information underscores that the omission of CMI reflected choice rather than technical necessity. Meta distinguished the portions of its training corpus that were licensed from those drawn from Objaverse-XL—a distinction that itself requires maintaining provenance information about training data. When Meta wanted evaluation assets of unencumbered provenance, it engaged professional 3D artists to create meshes by hand for a separate, publicly released evaluation dataset. And Meta engineers its data-collection systems to read and honor machine-readable usage signals when it elects to do so: Meta publicly identifies a crawler, "Meta-ExternalAgent," that "crawls the web for use cases such as training foundation AI models," and tells website operators that by configuring a robots.txt file they "can specify to the Meta web crawlers how you would prefer them to interact with your site." With respect to the works of Plaintiff and the Class, by contrast, Meta neither honored nor preserved the machine-readable license terms and NoAI designations conveyed with the works.

127. The dataset Meta identified as its source also told its users that the works' licenses govern. In addition to the instruction quoted above, the Objaverse-XL paper Meta cites states that "[u]sers should follow the license of the individual objects distributed as part of this dataset," that "[n]ew tasks must make sure to follow the license of the dataset and the license of the individual objects distributed as part of the dataset," and that "[t]he individual objects are subject to the licenses that they are released under, and users need to assess license questions based on downstream use." Deitke et al., *Objaverse-XL: A Universe of 10M+ 3D Objects* (2023), Apps. C.5, C.6. The per-object license field in the dataset's annotation table is the means the dataset provides for doing so. Upon information and belief, Meta read that table to obtain the works and discarded the license field. The same paper directs users to follow "the

[4] See *SAM 3D: 3Dfy Anything in Images*, arXiv:2511.16624 (Nov. 2025), https://arxiv.org/abs/2511.16624; Meta AI, https://ai.meta.com/blog/sam-3d/ (Nov. 19, 2025).

terms of service for each platform"—terms that, for Sketchfab, prohibit the use of NoAI-designated works in datasets for, in the development of, or as inputs to generative AI programs.

128. Meta assembled and processed its SAM 3D training corpus after February 2023, when Sketchfab announced the NoAI designation, and after March 23, 2023, when Sketchfab's updated Terms of Use took effect prohibiting the use of NoAI-designated models in datasets for, in the development of, or as inputs to generative AI programs. By that time, the presence of NoAI-designated works in Objaverse had been publicly reported and protested by creators, and the removal of rights-management information from AI training data was the subject of widely publicized litigation—including litigation against Meta itself concerning the removal of CMI from text training data, as alleged below.

129. Meta does not confine the products of this training corpus to its own internal systems. Meta has publicly released the SAM 3D model checkpoints and inference code, under license terms that authorize recipients to use, reproduce, distribute, copy, and create derivative works from them; Meta's released inference code exports generated meshes in standard 3D file formats. Meta also operates a public web demonstration—the Segment Anything Playground—through which members of the public generate and obtain 3D reconstructions from images, and has deployed SAM 3D in consumer-facing products, including Facebook Marketplace's "View in Room" feature, which delivers generated three-dimensional reconstructions of photographed objects to end users' devices.[5]

130. Generative 3D systems trained on Objaverse-derived corpora memorize and reproduce works in their training data. Published empirical research has documented that generative 3D models trained on subsets of Objaverse-XL produce replicas of training shapes.[6] Upon information and belief, the SAM 3D model weights that Meta has publicly distributed encode, and are capable of reproducing, works from Meta's training corpus, without any of those works' CMI.

---

[5] See https://github.com/facebookresearch/sam-3d-objects; https://huggingface.co/facebook/sam-3d-objects.

[6] See *Memorization in 3D Shape Generation: An Empirical Study*, arXiv:2512.23628 (2025), https://arxiv.org/abs/2512.23628.

~~112.~~131. Upon information and belief, Meta used Objaverse-derived references to identify and obtain source works, then rendered, transformed, and processed those works into machine-learning inputs for SAM 3D ~~in a manner that removed, failed to preserve, or disregarded the creator-identifying information~~in a manner that removed the creator-identifying information, license terms, and other CMI that accompanied the works when originally distributed.

132. The allegations in this Complaint made on information and belief rest on, among other sources: Defendant's published description of SAM 3D and of the data on which it was trained; the model weights and inference code Defendant publicly released for SAM 3D; the Objaverse-XL research paper, documentation, annotation records, and download tooling; the Objaverse 1.0 collection and metadata hosted on Hugging Face; the glTF 2.0 specification; Sketchfab's published announcements, terms of use, and model pages; the public docket in *Kadrey v. Meta Platforms, Inc.*; and counsel's examination of the model files, dataset records, and web pages described above. The remaining facts—the configuration of Defendant's pipeline and the contents of Defendant's data infrastructure—are within Defendant's exclusive possession and are not available to Plaintiff before discovery.

**H. Defendant's Intentional Removal of CMI**

133. Defendant's removal of CMI was intentional. It was not an accident, an oversight, or the unavoidable byproduct of a process indifferent to CMI. As alleged above: (i) Defendant's systems read the works' CMI and used it to identify, acquire, deduplicate, and track the works; (ii) Defendant selectively preserved the per-work metadata useful to its engineering purposes—content hashes, file identifiers, quality scores—while discarding the adjacent fields identifying each work's creator and license; (iii) Defendant defined the schema of its own training records to exclude those fields; (iv) Defendant subjected the works to individualized, per-mesh filtering and human review while recording no attribution or license information for any of the millions of works it examined; and (v) Defendant declined feasible, cost-free, information-preserving alternatives that were before it in the very dataset and file formats it used. Defendant's pipeline singled out and excised CMI while leaving the works themselves intact.

134. Section 1202(b) of the DMCA provides that "[n]o person shall, without the authority of the copyright owner or the law—(1) intentionally remove or alter any copyright management information . . . knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b).

135. The statute requires that removal of CMI be intentional—deliberate rather than accidental or inadvertent—and, separately, that the defendant know or have reasonable grounds to know that the removal will induce, enable, facilitate, or conceal infringement. Where Congress required conduct undertaken for a particular purpose, it said so expressly in the adjoining subsection: § 1202(a) reaches only conduct undertaken "knowingly and with the intent to induce, enable, facilitate, or conceal infringement." Section 1202(b)(1) contains no such clause. A defendant that deliberately removes CMI acts within the statute's terms whether or not suppressing CMI was its ultimate objective, so long as the statute's knowledge element is satisfied—as this Complaint alleges it is.

136. Defendant's omission of CMI also served a concealment function that Defendant understood. Retaining per-work attribution and license information in a training corpus creates records tying a developer's systems to identifiable creators' works and to identifiable license restrictions—records that platform operators, creators, litigants, and courts can later examine—and increases the risk that a generative model will reproduce attribution information in its outputs, revealing the sources of its training data. Removing that information reduces the traceability of the training corpus and obscures both the identity of the works used and the restrictions that governed them. Upon information and belief, Defendant omitted CMI from its 3D training corpus in part to reduce the traceability of its training data and to conceal the identity and license status of the works it used. Defendant's public description of SAM 3D's training data illustrates the point: it discloses that Defendant trained on approximately 2.7 million meshes derived from Objaverse-XL, but identifies no work, no creator, and no license, and nothing Defendant has preserved or disclosed would allow a creator to learn that his work was among them. Plaintiff learned that his works had been swept into the dataset from which Defendant drew its training

data only through search tools offered by the website hosting that dataset, not from any record Defendant kept.

137. Defendant's own records show that, within its generative-AI program, the retention or removal of rights-management information is a deliberate design decision—and that Defendant has resolved it in favor of removal. In *Kadrey v. Meta Platforms, Inc.*, No. 3:23-cv-03417-VC (N.D. Cal.), litigation concerning Defendant's Llama language models, internal Meta communications filed on the public docket show Defendant's data engineers, in October 2023, reviewing category by category what information to strip from copyrighted works used as training data. In a discussion thread titled "remove more copyright," a Meta engineer reported that "[c]urrently we are removing all the copyright paragraphs from beginning and the end of the paper" and proposed to "also try to remove any line containing 'ISBN', 'Copyright', '©', 'All rights reserved'"; a Meta AI researcher reviewing the work responded that this "should be doable for most papers and give us a nice little boost." *Kadrey*, Dkt. 395-3, Ex. 2 (filed Jan. 15, 2025). The same thread records Meta personnel weighing "whether it is better to try and remove" author indexes, and describing "an intentional decision to keep" other metadata because removing it would degrade the training text. The operative complaint in that action alleges that Meta's resulting software removed lines containing "ISBN," "Copyright," "©," "All rights reserved," and "DOI," together with phrases stating that copying the work was infringement, *Kadrey*, Dkt. 407 ¶¶ 88–90, and on March 7, 2025, the court held that those plaintiffs had adequately alleged that Meta intentionally removed CMI to conceal copyright infringement. *Kadrey*, Dkt. 471 at 2–3.

138. Plaintiff does not allege that the same code or personnel processed the three-dimensional works at issue here; the text pipeline described in *Kadrey* and the 3D pipeline described above are different systems. Plaintiff alleges that the same corporate practice governed both. Meta's engineers treat the question of what accompanying information to carry into a training corpus as a choice to be made—retaining metadata that improves the model and stripping the information that identifies a work's owner and the terms of its use—and, where that choice has been documented, Meta chose removal. By the time Meta assembled its 3D training corpus, the team preparing its generative-AI training data had already confronted that choice, resolved it in favor of removing copyright information, and asked whether its

data-processing decisions were being applied "consistently across all data sources." *Kadrey*, Dkt. 395-3, Ex. 2. Upon information and belief, the absence of creator, license, and NoAI information from Meta's 3D training records reflects that same deliberate practice, not an accident of format.

139. Plaintiff does not allege that machine-learning training inherently or necessarily severs works from their CMI, nor that liability arises from format conversion as such. Plaintiff alleges that Defendant built and operated a data pipeline that read the works' CMI, could have preserved that CMI at negligible cost, preserved other per-work information instead, and wrote training copies and records from which the CMI—and only the CMI—was missing. The absence of CMI from Defendant's training corpus is the result of Defendant's choices about what to keep and what to discard.

### ~~H.~~I. Plaintiff Suffered Harm and Concrete Injury

~~113.~~140. As a professional artist and creator of photogrammetry-based[7] 3D models, Plaintiff has invested substantial time, skill, and financial resources in developing his professional practice.

~~114.~~141. These investments include professional-grade camera equipment, drones, specialized computing hardware capable of processing large photogrammetry datasets, and licensed software used to reconstruct and refine three-dimensional models from Plaintiff's original photographic inputs. Plaintiff has also invested substantial time and labor in capturing imagery, processing scans, editing meshes and textures, and preparing models for distribution on online platforms.

~~115.~~142. Since approximately 2018, Plaintiff has created and published hundreds of original 3D models through various online platforms used by the global 3D artist community. These platforms include Sketchfab, CGTrader, Thingiverse, and Polycam.

~~116.~~143. On Sketchfab alone, Plaintiff has published more than four hundred original 3D models which are displayed and distributed through an integrated online viewer that allows users to evaluate the models. Plaintiff's models have collectively received more than 600,000 views on Sketchfab

[7] Photogrammetry is a specialized technique that involves capturing large numbers of high-resolution photographs of real-world objects and environments and processing those images through specialized software in order to reconstruct accurate digital three-dimensional assets.

alone. At the time Plaintiff published his models on Sketchfab, ~~he conveyed his restrictions on their use with the CC-BY (attribution) Creative Commons license.~~ he conveyed his restrictions on their use through Creative Commons licenses—principally the CC-BY (attribution) license and, for some works, the CC BY-NC-SA and CC BY-SA licenses.

~~117.~~ 144. Plaintiff's professional practice has historically depended on public visibility of his published works. Plaintiff used Sketchfab as a central portfolio through which potential clients—including artists, developers, and commercial entities—could discover his work, evaluate its quality, and engage him for purchase, licensing opportunities, or additional freelance projects.

~~118.~~ 145. Prior to the emergence of generative artificial intelligence systems trained on large-scale 3D datasets identified herein, Plaintiff regularly received economic opportunities from this portfolio-based model. Plaintiff sold and licensed models through the Sketchfab marketplace and other platforms and used his publicly available work to obtain freelance opportunities in visual effects and related fields. For example, Plaintiff was engaged to perform 3D scanning work for artistic and commercial projects after clients discovered his work through his online Sketchfab portfolio.

~~119.~~ 146. In addition to publishing models for portfolio visibility and community collaboration, Plaintiff has also monetized his work through licensing and marketplace sales. Plaintiff has sold and licensed his models through digital asset marketplaces such as CGTrader and through Sketchfab's integrated marketplace. Plaintiff has also negotiated direct licenses with companies seeking to incorporate his models into their own digital products and services.

~~120.~~ 147. Attribution plays a critical role in Plaintiff's ability to generate income from his work. Plaintiff's use of Creative Commons attribution licenses was intended to allow his models to be shared while ensuring that his identity remained associated with the works, thereby enabling prospective clients to locate his portfolio and engage him for paid opportunities. Plaintiff has, in fact, received professional credit for his work, including attribution in connection with third-party projects, which contributes to his reputation and visibility within the industry.

~~121.~~ 148. Recognizing the importance of this attribution-based model, Plaintiff has in the past actively pursued unlawful redistribution and copying of his work, including by issuing Digital

Millennium Copyright Act takedown notices after discovering that third parties had reproduced or redistributed his models without permission.

~~122.~~149. Plaintiff has also utilized tools available on hosting platforms, such as Sketchfab, designed to communicate restrictions on the use of his works in automated data collection or artificial intelligence systems.

~~123.~~150. For example, shortly after Sketchfab introduced a "NoAI" designation in February 2023, Plaintiff manually applied the NoAI tag to each of the more than four hundred models published on the site. This action reflected Plaintiff's explicit decision to prohibit the use of his works for generative AI training purposes.

~~124.~~151. Despite these steps, shortly after applying the NoAI designation on his works hosted on Sketchfab, Plaintiff discovered that his works were referenced within the Objaverse dataset. The website hosting the Objaverse dataset provided tools allowing creators to search for models associated with their accounts. Using those tools, Plaintiff located numerous works of his within the dataset.

152. The dataset's own records confirm that Plaintiff's works are among the Sketchfab works Objaverse-XL indexes, and that they were indexed together with their CMI. A review of the 798,759 records that make up the Sketchfab component of Objaverse-XL for Plaintiff's Sketchfab account identified 243 works that Plaintiff created and published between March 2018 and July 2022. For each of those works, the corresponding record names Plaintiff's account and display name, links to his profile, states the Creative Commons license he selected for the work, and designates the work as downloadable. As captured in the dataset, 213 of those works were licensed CC BY 4.0, 29 were licensed CC BY-NC-SA 4.0, and one was licensed CC BY-SA 4.0. The model files for representative works of Plaintiff, retrieved through the dataset's own software, carry in their headers Plaintiff's name, a link to his Sketchfab profile, and the applicable Creative Commons license.

153. Meta has stated that it selected approximately 2.7 million meshes from Objaverse-XL and its separately licensed datasets for SAM 3D pretraining, but it has not disclosed which meshes it selected. Upon information and belief, one or more of Plaintiff's 243 works indexed in Objaverse-XL were among

the meshes Meta selected and processed. That allegation rests on the presence of those specifically identified works in the dataset Meta used; on the scale of Meta's selection from a dataset indexing roughly ten million objects; on the character of Plaintiff's works—textured, artist-authored photogrammetry models of the kind that Meta's shape and aesthetic filters were designed to retain rather than discard; and on Meta's exclusive possession of the list of selected meshes. Meta's report describes no selection criterion that would have excluded Plaintiff's works, and given the number of Plaintiff's works in the dataset, it is implausible that Meta's selection missed all of them. In selecting and processing those works, Meta encountered the work-specific attribution and license information described above in the records and files from which it obtained them, and carried the works' content into its pretraining corpus without it.

~~125.~~154. Plaintiff raised concerns regarding this issue with individuals at Sketchfab and publicly objected to the inclusion of his works within AI-related datasets despite the NoAI restrictions he had applied to his models. Plaintiff was informed that Sketchfab had limited ability to prevent entities from copying and using the models once they had been indexed or collected by third-party datasets.

~~126.~~155. As a result of these developments, Plaintiff took steps to restrict access to his works. Plaintiff removed the free-download availability of his models and moved many of his works into the paid marketplace in an effort to prevent further ingestion of his works into AI training datasets. This shift has reduced the visibility and accessibility of Plaintiff's work within the broader creative community and has thus diminished the portfolio-driven exposure that previously generated business opportunities.

~~127.~~156. The events described above have also had a significant personal impact on Plaintiff. Upon learning that his works had been incorporated into datasets used to train generative artificial intelligence systems, against his explicit wishes, Plaintiff felt that the value of his creative labor had been appropriated without permission. Plaintiff experienced a loss of creative motivation to continue producing and sharing new models at the pace he had previously maintained. As a result, Plaintiff reduced the frequency with which he created and uploaded new works.

~~128.~~157. Taken together, ~~Defendant's conduct of removing, failing to preserve, or disregarding CMI~~Defendant's conduct of removing CMI—including attribution and licensing terms—

interferes directly with the attribution-based economic model for Plaintiff and Class Members. Defendant has undermined the licensing framework that governed Plaintiff's models and interfered with Plaintiff's and Class Member's ability to control how their works are used, attributed, and monetized.

~~129.~~158. Defendant's conduct has therefore diminished the value of Plaintiff's creative works, disrupted the market for licensing 3D assets, and interfered with Plaintiff's ongoing efforts to build and sustain a professional practice based on the creation and licensing of digital 3D models.

## CLASS ACTION ALLEGATIONS

~~130.~~159. **Class Definition:** Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as follows:

> All creators whose 3D models with CMI were published on Sketchfab, Thingiverse, Polycam, or other repositories and were incorporated into Objaverse-XL or derivative datasets used by Defendant to train its AI models.

~~131.~~160. Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

~~132.~~161. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

~~133.~~162. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

~~134.~~163. Numerosity/Ascertainability. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable. Datasets such as Objaverse-XL preserve certain metadata, including references to the original source repositories and model URLs from which the assets

were collected, enabling the models referenced in the dataset to be traced back to the specific platform pages where the works were hosted. Those platform pages identify the creator of the work. As a result, the creators whose works were referenced in Objaverse-derived datasets—including Plaintiff and members of the proposed Class—can be identified through systematic analysis of the dataset metadata and the corresponding source repositories.

~~135.~~164. Typicality. Plaintiff's claims are typical of the claims of the Class because Plaintiff's 3D Models were included in the datasets used by Defendant in the training of Defendant's AI models. Defendant trained commercial generative AI systems on Plaintiff's 3D models after removing the copyright management information that accompanied those works. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

~~136.~~165. Adequacy. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests coincide with, and not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

~~137.~~166. Common Questions of Law and Fact Predominate. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

(a) Whether Defendant used datasets derived from Objaverse-XL, or related datasets to identify and obtain 3D models created by Plaintiff and members of the Class.

(b) Whether the works created by Plaintiff and members of the Class were originally distributed on platforms such as Sketchfab, Thingiverse, or Polycam together with copyright management information, including creator attribution, licensing terms, and conditions governing reuse.

(c) Whether the information accompanying those works—including creator identity, license designations, attribution requirements, and related metadata—constitutes copyright management information under 17 U.S.C. §1202.

(d) Whether Defendant copied or obtained Plaintiff's works for use in training generative artificial intelligence systems.

(e) Whether, in the course of copying, converting, rendering, preprocessing, or ingesting those works into its AI training pipeline, Defendant ~~removed, altered, or failed to preserve the copyright management information~~removed or altered the copyright management information associated with those works.

(f) Whether Defendant knew, or had reasonable grounds to know, that ~~the removal or failure to preserve copyright management information~~the removal or alteration of copyright management information would induce, enable, facilitate, or conceal infringement within the meaning of 17 U.S.C. §1202(b).

(g) Whether Defendant's conduct violated 17 U.S.C. §1202.

(h) Whether Plaintiff and Class members are entitled to declaratory and injunctive relief requiring Defendant to cease training its commercial generative AI systems using Plaintiff's works which it stripped of copyright management information and to implement compliance measures sufficient to prevent further violations.

(i) Whether Plaintiff and Class members are entitled to statutory damages (including the appropriate statutory measure and amount) under 17 U.S.C. § 1203(c) based on Defendant's violations of 17 U.S.C. § 1202.

~~138.~~167. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential

difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Digital Millennium Copyright Act
### 17 U.S.C. § 1202(b)(1)
### (Removal of Copyright Management Information)

~~139.~~168. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

~~140.~~169. Plaintiff and members of the proposed Class are creators of original 3D models that are distributed on public repositories including, but not limited to, Sketchfab, Thingiverse, and Polycam.

~~141.~~170. When distributed on those platforms, the works were accompanied by copyright management information ("CMI"), including the creator's identity, the title of the work, licensing terms governing reuse, attribution requirements, and other information identifying the conditions under which the work could be used.

~~142.~~171. This information constitutes copyright management information within the meaning of 17 U.S.C. §1202(c).

~~143.~~172. Defendant used datasets derived from Objaverse-XL, or related datasets to identify and obtain copies of Plaintiff's and Class members' works from the repositories where those works were originally hosted or from hosted copies of those works, including the Objaverse collection hosted on Hugging Face.

~~144.~~173. Defendant then copied and processed those works through machine-learning preprocessing pipelines designed to convert raw 3D assets into inputs suitable for training generative artificial intelligence systems.

174. Count I is a claim about Defendant's treatment of copies of existing works at the input stage of training: it challenges Defendant's removal of CMI from the copies of Plaintiff's and Class members' works that Defendant obtained and processed in the course of preparing them for training,

before any model was trained. It does not depend on the content of any output of SAM 3D. Deleting the electronic information that accompanies a computer file is a paradigm of the conduct § 1202(b)(1) prohibits, *see Doe v. GitHub, Inc.*, No. 24-7700, slip op. at 14 (9th Cir. Sept. 16, 2026) (removal and alteration require "an affirmative act with respect to CMI connected to a work that already exists," citing "delet[ing] the electronic information that may accompany a computer file" as a paradigmatic violation (quoting 4 Nimmer on Copyright § 12A.10[B][1][a] (2026))), and it is what Defendant did.

~~145.~~175. ~~These preprocessing operations including format conversion, mesh normalization, rendering, voxelization, and related transformations separate the expressive content of the work from the attribution information, licensing metadata, and other CMI associated with the work when originally distributed.~~Defendant configured these preprocessing operations—including format conversion, mesh normalization, rendering, voxelization, and related transformations—to carry forward the expressive content of each work while stripping from the copies it processed the attribution information, licensing metadata, and other CMI conveyed within and alongside the work as originally distributed. The operations Defendant selected preserved the works' geometry, structures, textures, and materials essentially in full, and preserved other per-work metadata useful to Defendant, while excising the information identifying each work's creator and license.

~~146.~~176. Through this process, Defendant intentionally removed, altered, or caused the removal or alteration of CMI associated with the works, including creator attribution, licensing terms, and other identifying information.

177. Defendant's removal and alteration of CMI was intentional within the meaning of 17 U.S.C. § 1202(b)(1). It was the product of deliberate design, configuration, and curation choices—alleged above—by which Defendant's systems read the works' CMI, preserved the works' expressive content and the per-work metadata useful to Defendant, and stripped the works' CMI from the copies Defendant processed for training and from the records Defendant kept of them, notwithstanding feasible and cost-free means of preserving it. Defendant's removal of CMI was not accidental or inadvertent, and it was not the necessary byproduct of any format constraint.

~~147.~~178. Defendant then incorporated these CMI-stripped representations of Plaintiff's works into the training datasets used to develop its generative artificial intelligence systems.

~~148.~~179. Defendant knew, or had reasonable grounds to know, that the works referenced in Objaverse-XL originated from platforms such as Sketchfab, Thingiverse, and Polycam that distribute user-generated models together with creator attribution, license designations, and other CMI governing downstream use.

~~149.~~180. Defendant further knew, or had reasonable grounds to know, that ~~the preprocessing pipelines used to train generative AI systems do not preserve such CMI~~the preprocessing pipelines used to train generative AI systems, as Defendant configured them, strip such CMI from the copies they process and produce normalized representations of the works from which attribution, licensing metadata, and other rights-management information has been removed.~~ and instead produce normalized representations of the works that omit attribution, licensing metadata, and other rights-management information.~~

~~150.~~181. ~~By removing or failing to preserve this information~~By removing this information during the training process, Defendant ensured that neither the resulting AI systems nor their users could identify the creators of the underlying works or comply with the license conditions governing those works, including attribution requirements and restrictions on commercial use.

182. The infringement that Defendant's removal of CMI enabled, facilitated, and concealed is identifiable. In downloading and storing the works, Defendant reproduced them, 17 U.S.C. § 106(1); in rendering, normalizing, and converting them into training representations, Defendant reproduced them again in other formats, id.; and Defendant did so for a purpose the works' licenses withheld. Works licensed on condition of attribution could not be used without it; works licensed for non-commercial use could not be used to build commercial products; and works bearing the NoAI designation could not be used in AI datasets or training at all. A licensee that uses a work beyond the scope of its license infringes the copyright in that work. Defendant's own copying and use of the works, on terms their licenses did not permit, is the infringement to which Defendant's knowledge attaches—and it is infringement that the removal of each work's CMI made undetectable.

183. Had the works' CMI traveled with them into Defendant's training records, the consequences would have been concrete. Defendant's pipeline already filtered the works one by one on other recorded attributes—content hashes, geometric criteria, and aesthetic scores—and a recorded license field or source link would have been available to those same filters, to any reviewer, and to any subsequent audit, marking each restricted work for exclusion or compliance. Defendant acts on such signals when it records them: it distinguishes the licensed portions of its training corpus from the portions drawn from Objaverse-XL, and it honors machine-readable exclusion signals in other data-collection contexts. With the CMI removed, no filter could exclude restricted works, no reviewer could identify them, and no creator could learn from Defendant's records that his work had been used.

~~151.~~184. Defendant therefore knew, or had reasonable grounds to know, that the removal or alteration of CMI would induce, enable, facilitate, or conceal infringement of Plaintiff's and Class members' works.

~~152.~~185. As a direct and proximate result of Defendant's conduct, Plaintiff and members of the proposed Class have suffered injury.

~~153.~~186. Each work from which CMI was removed or altered constitutes a separate violation of 17 U.S.C. §1202(b)(1).

~~154.~~187. Pursuant to 17 U.S.C. §1203, Plaintiff and the Class are entitled to recover actual damages and Defendant's profits attributable to the violations, or statutory damages for each violation, together with costs and attorneys' fees.

~~155.~~188. Plaintiff and the Class are further entitled to injunctive and equitable relief prohibiting Defendant from continuing to remove or alter copyright management information conveyed with Plaintiff's and Class members' works~~prohibiting Defendant from continuing to remove, alter, or distribute works from which copyright management information has been removed~~.

**~~COUNT II~~**
**~~Violation of the Digital Millennium Copyright Act~~**
**~~17 U.S.C. § 1202(b)(3)~~**
**~~(Distribution or Use of Works Knowing CMI Has Been Removed)~~**

~~156. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.~~

157. Section 1202(b)(3) prohibits any person from distributing, importing for distribution, or otherwise using copyrighted works knowing that copyright management information has been removed or altered without authority.

158. As described above, Plaintiff's and Class members' works were originally distributed together with CMI identifying the creator of the work, the title of the work, and the licensing terms governing reuse.

159. This information constitutes CMI within the meaning of 17 U.S.C. §1202(c).

160. Defendant used datasets derived from Objaverse-XL, or related datasets to identify and obtain copies of Plaintiff's works from the repositories where those works were originally hosted.

161. In the course of copying, converting, rendering, normalizing, and otherwise preprocessing those works for use in AI training pipelines, the CMI associated with the works was removed, altered, or failed to be preserved.

162. Defendant thereafter used, distributed, and incorporated these CMI-stripped representations of Plaintiff's works within the training datasets used to develop its generative artificial intelligence systems.

163. Defendant knew, or had reasonable grounds to know, that the CMI associated with those works had been removed or altered without the authority of the copyright owners.

164. Defendant further knew, or had reasonable grounds to know, that the use of works from which CMI had been removed would induce, enable, facilitate, or conceal infringement of Plaintiff's and Class members' works.

By using and incorporating these works into its generative AI training datasets and systems, Defendant violated 17 U.S.C. §1202(b)(3).

165. As a direct and proximate result of Defendant's conduct, Plaintiff and members of the proposed Class have suffered injury.

165. Pursuant to 17 U.S.C. §1203, Plaintiff and the Class are entitled to recover actual damages and Defendant's profits attributable to the violations, or statutory damages for each violation, together with costs and attorneys' fees.

166. Plaintiff and the Class are further entitled to injunctive and equitable relief prohibiting Defendant from continuing to use or distribute works from which copyright management information has been removed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that the Court grant the following relief:

(a) Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

(b) A declaration that Defendant violated 17 U.S.C. § 1202(b)(1) by intentionally removing or altering copyright management information associated with Plaintiff's and Class Members' worksviolated 17 U.S.C. § 1202(b)(1) and § 1202(b)(3) by intentionally removing or altering copyright management information associated with Plaintiff's and Class Members' works and by distributing, using, or incorporating works knowing that such copyright management information had been removed or altered;

(c) Entry of injunctive relief requiring Defendant to cease removing or altering copyright management information conveyed with workscease removing, altering, or failing to preserve copyright management information from works obtained for use in generative artificial intelligence training systems;

(d) Entry of injunctive relief prohibiting Defendant from using or incorporating into artificial intelligence training datasetsprohibiting Defendant from distributing, using, or incorporating into artificial intelligence training datasets any works from which copyright management information has been removed or altered in violation of the DMCA;

(e) An order requiring Defendant to identify and account for the works of Plaintiff and members of the Class that were incorporated into datasets or training pipelines used to develop Defendant's generative artificial intelligence systems;

(f) Entry of injunctive relief requiring Defendant to preserve copyright management information associated with works used in future AI training datasets and to implement compliance measures sufficient to prevent further violations of 17 U.S.C. § 1202;

(g) An award of statutory damages and/or actual damages and Defendant's profits attributable to the violations pursuant to 17 U.S.C. § 1203;

(h) An award of Plaintiff's and the Class's reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 1203(b)(5);

(i) Pre- and post-judgment interest as permitted by law; and

(j) Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all the claims asserted in this Complaint so triable.

Date: ~~March 26, 2026~~September 16, 2026 Respectfully Submitted,

*/s/ William J. Edelman*
William J. Edelman (SBN 285177)
**MILBERG, PLLC**
~~227 W. Monroe Street, Suite 2100~~280 S. Beverly Drive, Penthouse
~~Chicago, IL 60606~~Beverly Hills, CA 90212
Tel: (771) 474-1121
wedelman@milberg.com

Michael A. Acciavatti ~~(pro hac vice forthcoming)~~(admitted pro hac vice)
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel: (212) 594-5300
macciavatti@milberg.com